**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| **HOWARD M. GOLDSTEIN,** | : | **CIVIL ACTION** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 13-3850** |
| | : | |
| **CARLINO DEVELOPMENT** | : | |
| **GROUP, INC.,** | : | |
| | : | |
| **Defendant.** | : | |

_____:

**Goldberg, J.**                                                                                    **May 20, 2015**

<u>**MEMORANDUM OPINION**</u>

  Plaintiff, Howard M. Goldstein, brought this action against his former employer, Carlino Development Group, Inc. ("CDG"), alleging discrimination and retaliation in violation of the Americans with Disabilities Act ("ADA"). Before me is CDG's motion for summary judgment, wherein CDG argues that it is not an "employer" subject to the requirements of the ADA because it employed fewer than fifteen people during the relevant time period. Because there are material factual disputes regarding the number of persons employed by CDG, summary judgment will be denied.

**I.  <u>FACTUAL AND PROCEDURAL BACKGROUND</u>**

  Unless otherwise indicated, the following facts are undisputed.

  Plaintiff began his employment as the Chief Financial Officer ("CFO") of CDG, a real estate development and management company, on July 24, 2006. (Am. Compl. ¶ 9; Def.'s Mot. Summ. J., Appx. 3.) In April of 2009, Plaintiff began suffering from advanced degenerative disc disease that required surgery. (Am. Compl. ¶ 39.)  The surgery was unsuccessful and Plaintiff

continued to suffer from the disc disease that eventually caused him to walk with a pronounced limp. (Id. at ¶ 40.)   Plaintiff was terminated by CDG President Peter W. Carlino and Vice President David A. Binder on June 16, 2009. (Id. at ¶ 47.) Plaintiff claims he was fired because of his disability and sued CDG under the ADA.

CDG's motion asserts that it is not an employer subject to liability under the ADA because it did not employ fifteen or more employees during the relevant time period, as required by the ADA. Plaintiff responds that CDG did employ more than fifteen employees because CDG and a separate entity, Carlino Development Group New Morgan Management, Inc. ("CDG-NMM") were sufficiently connected to combine their employees for counting purposes under the ADA's "covered entity" provision.

## II.   STANDARD OF REVIEW

### A.   Summary Judgment

A party moving for summary judgment bears the initial burden of demonstrating that there are no genuine issues of material fact and that judgment is appropriate as a matter of law. FED. R. CIV. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).   Once a properly supported motion for summary judgment has been made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue of material fact for trial.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).   An issue is "genuine" if a reasonable jury could rule in favor of the non-moving party based on the evidence presented. Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006).   The non-moving party cannot avert summary judgment with speculation or conclusory allegations, but rather must cite to the record.   Ridgewood Bd. of Educ. v. N.E. for M.E., 172 F.3d 238, 252 (3d Cir. 1999); FED. R.

CIV. P. 56(c).  On a motion for summary judgment, the court considers the evidence in the light most favorable to the non-moving party.  Anderson, 477 U.S. at 256.

### B.  "Employer" under the ADA

The ADA's prohibitions of discrimination and retaliation apply only to "covered entities." 42 U.S.C. § 12112(a). The ADA defines a "covered entity" to include an "employer." 42 U.S.C. § 12111(2). An "employer" is defined as "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agents of such person[.]" Id. at § 12111(5). The relevant contested portion of the ADA requirement here is whether CDG maintained "15 or more employees."

The United States Court of Appeals for the Third Circuit has determined that the fifteen-employee requirement of Title VII is a threshold substantive element of a plaintiff's claim. Nesbit v. Gears Unlimited, Inc., 347 F.3d 72, 83 (3d Cir. 2003); see also Arbaugh v. Y&H Corp., 546 U.S. 500, 516 (2006) (clarifying that the numerosity requirement is a substantive element of a Title VII claim). In Nesbit, the Third Circuit also held that "the ADA's fifteen-employee requirement is in all relevant respects indistinguishable from Title VII's." Id. at 77. Thus, CDG must demonstrate that, even accepting all evidence in the light most favorable to Plaintiff, as a matter of law CDG had fewer than fifteen employees during the relevant time period.

### III.   ANALYSIS

Plaintiff's employment with CDG ended in June 2009, and as such the relevant years to assess CDG's employee population are 2009 (the current calendar year) and 2008 (the preceding calendar year). See Walters v. Metro. Educ. Enters. Inc., 519 U.S. 202, 205 (1997) (focusing on the year in which the discrimination is alleged to have occurred and the calendar year prior).

3

### A. __The Agreed Upon Employees__

There are thirteen people that both parties agree were employees of CDG in 2008 and 2009. I will refer to this group as the "agreed-upon employees." (See Def.'s Mot. Summ. J., Appx. 1.)

While thirteen total persons were employed by CDG during this time period, there were never more than eleven of the agreed-upon employees working simultaneously. CDG's payroll information reflects that there were eleven consistent employees working for CDG from January 2008 until January 2009. (Id.) In January 2009, one of these consistent employees left CDG, and a new employee, Peter Miller, was hired in June of 2009. Similarly, Plaintiff was terminated in June 2009 and a new employee, Robert S. Kwitkowski was hired the following week, keeping the total number of simultaneous employees at eleven.[1] Therefore, it is undisputed that CDG maintained eleven agreed-upon employees for more than twenty weeks in the year/preceding year as defined by the ADA.[2]

---

[1] Though Plaintiff seems to count these people as a total of thirteen employees, he offers no contesting evidence that shows that all thirteen were ever working at the same time. (See Pl.'s Resp., p. 1.)

[2] There are two additional people, Laurie Humphreys and Thomas Simon, that Plaintiff argues should be considered to be CDG employees under the ADA. In determining whether an individual is an employee, the Court can apply the "payroll method" laid out by the United States Supreme Court in Walters. 519 U.S. at 206-07. This test looks to whether the employer has an employment relationship with the employee on the day in question, as is most readily demonstrated by the individual's appearance on the employer's payroll. Id. The court may also look at general principles of agency in determining whether an employment relationship exists. Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323-24 (1992); Walters, 519 U.S. at 211.

Plaintiff argues that Humphreys and Simon should be considered employees because they were on CDG's payroll, assigned employee numbers, and classified as "regular" employees on the CDG payroll. He also notes that both individuals were participants in CDG's health insurance plan. (Pl.'s Resp. 5-6.) CDG responds that Humphreys was Peter M. Carlino's personal gardener and Simon was his personal handyman, and that these individuals were on CDG's payroll "purely as a matter of administrative convenience because Mr. Carlino did not maintain a separate payroll system through which to pay them." (Def.'s Mot. Summ. J., p. 8 n.3

### B. **The Disputed Employees**

Plaintiff argues that for purposes of assessing the number of employees, a separate corporate entity, CDG-NMM, should be substantively consolidated with CDG. According to CDG, CDG-NMM was formed in November 2003 to perform property management and maintenance services in and around New Morgan Borough for a separate entity, New Morgan Properties, L.P. (See Def.'s Mot. Summ. J., Appx. 3.) Peter W. Carlino, the President of CDG, and several other Carlino family members collectively held a minority ownership interest in New Morgan Properties, L.P. (Carlino Decl. ¶¶ 52-53, 55.) CDG asserts that Stephen Najarian was the 100% owner and President of CDG-NMM. (Najarian Decl. ¶ 1; Def.'s Mot. Summ. J., Appx. 3.)

CDG-NMM had a number of employees from 2008 through 2009, including President Stephen Najarian, James Papola, Robert Williams, William Bailey, and Franklin Eisenhauer. However, it is unclear whether James Papola worked for CDG-NMM at all times in 2008 and 2009. (See Najarian Decl. ¶¶ 1, 12-13; Pl.'s Aff. ¶¶ 13-14 (acknowledging Papola was terminated at an unidentified point).) Accordingly, as the evidence indicates that James Papola may not have been an employee for twenty or more weeks during the relevant time period, I will assume that CDG-NMM only maintained four employees from 2008-2009. Thus, if Plaintiff's argument for substantive consolidation of CDG and CDG-NMM is successful, the total number of employees would rise from eleven to fifteen, the amount required for ADA liability.

---

(citing Walters, 519 U.S. at 211 (holding that presence on an employer's payroll is not dispositive of employee status).) Though I could apply an analysis under the payroll test and general principles of agency to determine if a genuine dispute of material fact exists as to the inclusion of these two individuals, I need not do so. Even if these two individuals were counted as employees, the total number of simultaneous CDG employees would increase to thirteen—still below the fifteen-employee threshold. Instead, the focus of the analysis is upon the five disputed employees of CDG-NMM, which resolves the instant motion.

### C.   Applicable Precedent Under the ADA

In Nesbit, the Third Circuit set out the standards for determining whether two entities should be consolidated into one for the purpose of counting employees under the ADA. 347 F.3d at 85-88. There are three situations when a company and its affiliates should be deemed a single employer for purposes of the ADA: "(1) where a company has split itself into entities with less than fifteen employees with the intent to evade [the ADA's] reach; (2) when a parent company has directed the subsidiary's discriminatory act of which the plaintiff is complaining;" or (3) when the two entities would be substantively consolidated in the bankruptcy context. Id. at 85-86.  The third scenario is at issue here.

Nesbit described the bankruptcy consolidation test as follows: "whether two or more entities' affairs are so interconnected that they collectively caused the alleged discriminatory employment practice. More colloquially, the question is whether the 'eggs'—consisting of the ostensibly separate companies—are so scrambled that we decline to unscramble them." Id. at 86. The court noted that substantive consolidation is difficult to achieve. Id. The inquiry should focus on:

> the degree of operational entanglement—whether operations of the companies are so united that nominal employees of one company are treated interchangeably with those of another. Relevant operational factors include (1) the degree of unity between the entities with respect to ownership, management (both directors and officers), and business functions (e.g., hiring and personnel matters), (2) whether they present themselves as a single company such that third parties dealt with them as one unit, (3) whether a parent company covers the salaries, expenses, or losses of its subsidiary, and (4) whether one entity does business exclusively with the other.

Id. at 87. Financial entanglements between the two entities are also relevant.  Id. at 87-88.

#### D.  Facts of Record

In support of the contention that CDG and CDG-NMM were so interconnected so as to allow substantive consolidation, Plaintiff relies upon a sworn affidavit attached to his response in opposition to the Defendant's motion, which claims that there was no operational distinction between employees of CDG and employees of CDG-NMM in the CDG office. (Pl.'s Aff. ¶ 16.) Plaintiff notes that, as CFO of CDG, he spoke numerous times with Mr. Najarian, the President of CDG-NMM, regarding the content of financial statements Plaintiff had prepared. (Id. at ¶ 3.) Plaintiff also claims to have worked on a project specifically for Mr. Najarian, where he assisted in the development of a spreadsheet that analyzed how Mr. Najarian's ownership share of CDG-NMM would be forfeited as the result of his non-payment of partner capital calls. (Id. at ¶ 6.)

According to Plaintiff's affidavit, "CDG's involvement in the New Morgan Project was extensive." Plaintiff explains:

> During the course of my employment with CDG, Peter W. Carlino and David Binder, my fellow employees at CDG, spent a significant amount of time working on the New Morgan Project. At times, the New Morgan Project consumed many days of the working week at CDG, with Peter [W. Carlino] working on the management and structure of CDG-NMM and David Binder preparing legal work for the same company. During this time period, I understood the New Morgan Project to be a responsibility of CDG, and we devoted many hours to it, without any attention to corporate distinctions.

(Id. at ¶¶ 8-9.)  Plaintiff further offers that Mr. Najarian and CDG President Peter W. Carlino had regular meetings in 2008 and 2009 about property issues. "During this time, Mr. Najarian was responsible for the sale of a commercial shopping center and a tract of land, in which Peter W. Carlino, as President of CDG, was also actively involved." (Id. at ¶ 4.)

Additionally, Plaintiff's affidavit indicates a unity of the two entities with respect to ownership and management, alleging that Mr. Najarian was also a one-third owner of CDG

during Plaintiff's employment. (Pl.'s Aff. ¶ 5.) Plaintiff reports that:

> Carlino family members had invested significant amounts of time and money into the New Morgan Project, and at no time did [Plaintiff] observe any officer or owner of CDG-NMM (whether Mr. Najarian or someone else) dictate strategy to Peter W. Carlino, or assert authority over the significant amounts of capital that were necessary to prevent the New Morgan Project from failing.

(Id. at ¶ 10.)

Plaintiff also points to a unity of hiring and personnel matters between the two entities by noting that James Papola, a CDG-NMM employee, was fired by Peter W. Carlino, the President of CDG. (Pl.'s Aff. ¶ 13.) At the request of Mr. Carlino, Plaintiff claims he was present during the termination meeting as a witness. (Id. at ¶ 14.) Further, the CDG-NMM employees also participated in CDG's group insurance policy. See DeAngelo v. DentalEZ, Inc., 2011 WL 1496513, at *4 (E.D. Pa. Apr. 15, 2011) (where consolidated insurance benefits, along with other similarities, were sufficient to create a material factual dispute as to whether two companies should be considered a single employer under Nesbit).

CDG responds that it was simply hired by CDG-NMM to perform bookkeeping and accounting functions, and that no CDG employees performed any additional work on behalf of CDG-NMM during 2008 and 2009. (Najarian Decl. ¶ 41; Carlino Decl. ¶ 66.) CDG does not contest that CDG-NMM employees were included in CDG's group insurance policy, but explains this as "simply a matter of economics and convenience" and notes that "New Morgan Management fully reimbursed CDG for 100% of the monthly insurance premiums related to its employees' participation in the CDG group policies." (Najarian Decl. ¶¶ 30-31.) Mr. Najarian, President of CDG-NMM, stated in his declaration that:

> During 2008 and 2009, neither CDG nor any employee of CDG had the authority to hire or fire [the CDG-NMM employees], to direct, control, or review their work, or to supervise them. Moreover, they did not report to CDG or to any of its

8

employees during that period, and nobody at CDG ever understood them to be, or treated them as, CDG employees.

(Najarian Decl. ¶ 13; <u>see also</u> Carlino Decl. ¶ 67.)

Given the evidence discussed above, I find that there is a genuine dispute of material fact as to whether CDG had management power of CDG-NMM employees and projects, and whether this, combined with the shared insurance, constitutes a unity of ownership and operations sufficient to warrant substantive consolidation.

Plaintiff also argues that CDG and CDG-NMM held themselves out to third parties as one entity because the two entities shared office space. (<u>Id.</u> at ¶ 12; Pl.'s Resp. at Ex. B, C.) In his affidavit, Plaintiff states "CDG-NMM and CDG shared the exact same office space located at 875 Berkshire Boulevard, Suite 203, Wyomissing, PA 19610." (Pl.'s Aff. ¶ 2; Pl.'s Resp. at Ex. B, C.)  He further claims that CDG-NMM employees frequented the shared office. CDG contests this fact. In his declaration, Mr. Najarian states the two entities maintained separate offices:

> Although New Morgan Management and CDG both used the same registered address of 825 Berkshire Blvd., Wyomissing, PA 19610, with respect to New Morgan Management, that address was used purely for the purposes of registration and as a mailing address for the administrative bookkeeping services that CDG performed for New Morgan Management. Neither I nor any employees of New Morgan Management actually performed our work out of that office location during 2008 or 2009. Rather, we worked out of an office at 200 Bethlehem Drive, Suite 100, Morgantown, PA 19543, which was inside the bounds of the New Morgan Project. During 2008 and 2009, neither CDG nor any of its employees ever worked out of New Morgan Management's Morgantown office.

(<u>See</u> Najarian Decl. at ¶ 37.) This conflicting testimony also creates a genuine dispute of material fact as to whether the entities shared the same office space and whether this meant they held themselves out as one entity, such that substantive consolidation would be appropriate.[3]

---

[3] Furthermore, though Plaintiff does not make this argument, there is precedent that two entities that use similar names seem to present themselves as a single entity for purposes of substantive consolidation. <u>Thorpe v. Reading Hosp.</u>, 2006 WL 3196456, at *4 (E.D. Pa. Nov. 1, 2006)

**IV.**   <u>**CONCLUSION**</u>

  Plaintiff has provided sufficient evidence to create a genuine dispute of material fact as to whether CDG and CDG-NMM should be substantively consolidated into one entity for purposes meeting the ADA's numerosity requirement. A reasonable jury could conclude that the two entities were significantly intertwined, and therefore, that CDG-NMM's four employees should be counted together with the eleven employees of CDG, satisfying the ADA's fifteen-employee threshold. Thus, Defendant's motion for summary judgment will be denied.

  An appropriate Order follows.

---

("With very similar names (The Reading Hospital and The Reading Hospital and Medical Center) and the common mission of operating The Reading Hospital, these two entities seem to present themselves to the public as a single entity"). The two entities here, Carlino Development Group, Inc. and Carlino Development Group New Morgan Management, Inc., have very similar names and are both involved in property management, further supporting Plaintiff's argument that CDG and CDG-NMM held themselves out as one entity.